UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DANIEL COURNEY,

        *Plaintiff*,

  v.

CITY OF ENGLEWOOD et al.,

        *Defendants*.

No. 22-cv-05181 (MEF)(AME)

**OPINION and ORDER**

**Table of Contents**

I.    **Background**
     **A.**   **The Allegations**
     **B.**   **The Lawsuit**
     **C.**   **The Motion**
II. **The Arresting Officers**
     **A.**   **General Principles**
     **B.**   **Analysis**
        **1.**   **New Jersey Law**
        **2.**   **Non-New Jersey Cases**
        **3.**   **Conclusion**
     **C.**   **Two Added Points**
     **D.**   **The Counterarguments**
III. **Police Supervisors**
IV. **Conclusion**

\*   \*   \*

Local police officers arrested a man and charged him with violating a restraining order.

The man sued the officers, alleging false arrest.

The arresting officers now move to dismiss.

Their motion is granted.

## I.    **Background**

### A.    **The Allegations**

The following allegations[1] are relevant for now.

A man[2] regularly protested outside Metropolitan Medical Associates ("MMA") in Englewood, New Jersey.  <u>See</u> Second Amended Complaint ("Complaint") (ECF 21) ¶¶ 14, 19.

A particular doctor ("Doctor") worked at MMA.  <u>See</u> <u>id</u>. ¶¶ 26, 28.

In March 2021, a state judge conducted a hearing and then issued a restraining order.  <u>See</u> Complaint, Exhibit B.  The order barred the man "from having any contact with [the Doctor]." Complaint ¶¶ 27-28; Complaint, Exhibit B, at 8:5-6.

Around five months later, the man was protesting outside MMA. <u>See</u> <u>id</u>. ¶¶ 20-26.  Local police officers arrested him there. <u>See</u> <u>id</u>. ¶¶ 19-21, 26.

Per the arrest paperwork, the man was arrested for, among other things, violating the judge's restraining order.[3]  <u>See</u> Complaint, Exhibit A, at 5 (Detective Moreno's complaint).

The arresting officers noted that the Doctor was on site and noise from the protest had reached his office.  <u>See</u> <u>id</u>. at 8.

The man was jailed for six days, and at that point the case against him was dismissed by state authorities.  <u>See</u> Complaint ¶¶ 30, 39.

---

[1]  Because this is a motion to dismiss, the Court must treat all the Complaint's allegations as true.  <u>See</u> <u>McTernan</u> v. <u>City of York</u>, 577 F.3d 521, 526 (3d Cir. 2009).  Whether they are true --- that would be an issue for later in the case.

[2]  Daniel Courney.

[3]  Violating a restraining order is a crime under New Jersey law. <u>See</u> N.J.S.A. § 2C:29-9a; <u>see</u> <u>also</u> Complaint, Exhibit A, at 5 (citing <u>id</u>.).

   **B.**   **The Lawsuit**

In light of the above, the man filed this lawsuit.  From here, he is called "the Plaintiff."

The Plaintiff sued a number of defendants.

The remaining claims in the case run against four members of the Englewood Police Department.[4]

Two of these are the arresting officers,[5] who are the focus of this Opinion and Order.  They are called "the Defendants."

The other two police defendants are supervisory officials.[6]  They are discussed only briefly here, in Part III.

                          *     *     *

As to the four members of the police force, the Plaintiff pressed (a) federal claims under Section 1983, see 42 U.S.C. § 1983, and (b) state claims under the New Jersey Civil Rights Act, N.J.S.A. § 10:6-2.[7]

Section 1983 gives private parties a way to sue for underlying violations of the federal constitution.  See 42 U.S.C. § 1983.

And the New Jersey Civil Rights Act does the same thing for violations of the federal and state constitutions.  See Cruz v.

---

[4]  The claims against the police department itself were dismissed last year.  See Courney v. City of Englewood, No. 22-cv-5181 (ECF 30) (D.N.J. Mar. 13, 2024).  And earlier this month, claims were dismissed against the City of Englewood and the Englewood City Council.  See Courney v. City of Englewood, 2025 WL 2017252 (D.N.J. July 17, 2025).

[5]  The Complaint names them as Officer Calderin and Detective J. Moreno.  Full names are not given.

[6]  The Complaint names them as Chief Lawrence Suffern and Deputy Chief Thomas Loschiavo.

[7]  In a freestanding count, the Plaintiff also sought costs under 42 U.S.C. § 1988.  See Complaint ¶ 81.  But Section 1988 does not create an independent cause of action.  See Tunstall v. Off. of Jud. Support of Ct. of Common Pleas of Del. Cnty., 820 F.2d 631, 633 (3d Cir. 1987).  Therefore, that claim must be dismissed on the merits.

<u>Camden Cnty. Police Dep't</u>, 466 N.J. Super. 1, 9 (App. Div. 2021).

The Plaintiff alleged a number of different underlying constitutional rights were violated.  <u>See</u> Complaint ¶¶ 32-78. But he did not explicitly indicate which rights were in play as to which defendants.

This said, it strongly appeared that the claims against the four police defendants were for false arrest, allegedly in violation of the Fourth Amendment to the federal constitution.

The Court explained its understanding and gave the parties a chance to weigh in.  <u>See</u> ECF 39.  None did, so the Court proceeds here on the basis that the Plaintiff's claims are for false arrest under the Fourth Amendment.  <u>See</u> ECF 40.

## C.    **The Motion**

The four police defendants referenced above have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).

Their motion is now before the Court.

## II.  **The Arresting Officers**

The Defendants[8] argue that the false arrest claims against them must be dismissed on qualified immunity grounds.  <u>See</u> Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion to Dismiss") (ECF 33) at 29-33.

This argument is persuasive.  After a brief discussion of the governing law, <u>see</u> Part II.A, the Court explains why.  <u>See</u> Part II.B.

## A.    **General Principles**

Three general principles are relevant here.  Walk through them in this section.[9]

---

[8]  Recall that these are the two officers who were directly involved in arresting the Plaintiff.  <u>See</u> footnote 5.

[9]  The New Jersey Civil Rights Act incorporates the federal case law on qualified immunity.  <u>See</u> <u>Hernandez</u> v. <u>Twp. of Lyndhurst</u>, 765 F. Supp. 3d 401, 409 (D.N.J. 2025) (citing <u>Gormley</u> v. <u>Wood-El</u>, 218 N.J. 72, 113 (2014)).  So the Plaintiff's Fourth

\*    \*    \*

<u>First</u>, a police officer is entitled to qualified immunity from a false arrest charge "if a reasonable officer could have believed [the] arrest to be lawful," given "the information the [arresting] officers possessed." <u>Hunter</u> v. <u>Bryant</u>, 502 U.S. 224, 227 (1991) (quoting <u>Anderson</u> v. <u>Creighton</u>, 483 U.S. 635, 641 (1987)); <u>see</u> <u>generally</u> 5 Am. Jur. 2d <u>Arrest</u> § 126 (2025).

To be "lawful," there must be sufficient evidence of probable cause as to each element of the offense. <u>See</u> <u>Hunter</u>, 502 U.S. at 227; <u>Wright</u> v. <u>City of Phila.</u>, 409 F.3d 595, 602 (3d Cir. 2005).

Take as an example an arrest made under Pennsylvania law for criminal trespass.

The elements of that crime: that a person "(1) entered or broke into a building or occupied structure, (2) knowing that she or he had no license or privilege to do so." <u>Wright</u>, 409 F.3d at 603 (citing 18 Pa. Stat. and Cons. Stat. Ann. § 3503(a)(1)).

An officer is entitled to qualified immunity if a "reasonable officer" in his shoes (with "the information []he . . . possessed"[10]) "could have believed" that there was probable-cause-level evidence as to both breaking and entering (the first element) and lack of permission (the second element).

\*    \*    \*

<u>Second</u>, when assessing whether an officer could have reasonably believed there was probable cause, a court must look to "clearly established law." <u>Hunter</u>, 502 U.S. at 227.

To see the point, come back to the Pennsylvania criminal trespass statute.

---

Amendment claims under the federal cause of action (Section 1983) and the state cause of action (the New Jersey Civil Rights Act) are not analyzed separately. They rise or fall together.

[10] <u>Hunter</u>, 502 U.S. at 227. The availability of qualified immunity turns on the factual information that was known to the officers; their subjective motives do not generally count. <u>See</u> <u>Devenpeck</u> v. <u>Alford</u>, 543 U.S. 146, 153 (2004); <u>Hunter</u>, 502 U.S. at 228; <u>Blaylock</u> v. <u>City of Phila.</u>, 504 F.3d 405, 411 (3d Cir. 2007).

Imagine that a police officer arrests a woman for criminal trespass based on her sneaking into a nylon ice shack.[11]

And imagine further that the officer is later sued for false arrest.

Does the officer get qualified immunity?

Yes, if he "could have believed" based on "clearly established law"[12] that the woman's entering the ice shack counts as entering "a building or occupied structure" for Pennsylvania criminal trespass law.[13]

After all, the thinking goes, the underlying questions are not easy.

Is a temporary shelter from the cold a "building"?  Maybe, maybe not.  If people fish in it but do not sleep in it, is an ice shack "occupied"?  Again, reasonable minds can disagree.

As state courts[14] work through these questions, the precise location of the metes and bounds laid down by Pennsylvania's

---

[11]  That is, a pop-up tent-like structure left out on a frozen-over lake, for keeping warm while ice fishing.

[12]  Like an on-point Pennsylvania Supreme Court decision.  See footnotes 13-14.

[13]  "To determine whether an arrest is valid, [courts] look to the law of the state where the arrest took place" and conduct "an examination of the elements of the crime at issue."  Wright, 409 F.3d at 601.

[14]  Which courts count?  This is not crystal clear.  When the key question is a matter of federal law, do the decisions of the Supreme Court and the courts of appeals "clearly establish" the law, or do district court decisions have a role to play, too?  There seems to be authority on each side of the ledger.  Compare Jefferson v. Lias, 21 F.4th 74, 81 (3d Cir. 2021) ("We may also take into account district court cases, from within the Third Circuit or elsewhere.") (cleaned up) and Doe v. Delie, 257 F.3d 309, 321 n.10 (3d Cir. 2001) ("district court opinions do play a role in the qualified immunity analysis") (citing, e.g., Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996); Brown v. Grabowski, 922 F.2d 1097, 1118 (3d Cir. 1990)), with Montemuro v. Jim Thorpe Area Sch. Dist., 99 F.4th 639, 645 (3d Cir. 2024) ("The extant case law must be derived from established Supreme Court and Third Circuit precedent[.]") and Minor v. Del. River & Bay Auth., 70 F.4th 168, 174 (3d Cir. 2023) (same).  Same issue when

criminal trespass statute will become fixed in place, solidly and visibly.  The law's border line (doing this is fine, but if you do that you can go to jail) will become "clearly established."

But until the law has been definitively clarified by judicial interpretation, the thinking goes, the costs of getting the law's meaning wrong should not have to be carried by the police officer.

If he reasonably treats an ice shack as a "building" and makes an arrest on that basis, the officer should not have to answer in a damages suit.  He gets qualified immunity even if, later, a judge might look back and say that a shack does not actually count as a building.

But _after_ the law has been definitively clarified, once the meaning of the criminal trespass law has been "clearly established" --- then things shift.

If state judges make it plain that there can be no trespass arrests based on the idea that an ice shack is a "building," and an officer then arrests a person on that basis, then there is no qualified immunity for the arrest.

*      *      *

The _third_ piece of the puzzle:

The job of finding the case law on ice shacks and criminal trespass --- who does it belong to?

Stated more generally: once the defendants have started things off by raising qualified immunity, who has to come forward and show what the "clearly established" law actually is?

The plaintiff.

---

the critical question turns on state law.  Compare Montemuro, 99 F.4th at 645 ("The extant case law must be derived from . . . the highest court in that state when determining the contours of a state-granted right[.]), _with_ Acierno v. Cloutier, 40 F.3d 597, 620 (3d Cir. 1994) (looking to "published decisions of lower state courts in Delaware").  (The Supreme Court has not weighed in on this.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 n.32 (1982).)

If he does not come forward with sufficiently on-point indications that the relevant law is "clearly established," then the defendant gets qualified immunity.  See Davis v. Scherer, 468 U.S. 183, 197 (1984); Urda v. Sokso, 2025 WL 2046175, at *1 (3d Cir. July 22, 2025); Dongarra v. Smith, 27 F.4th 174, 178 (3d Cir. 2022); El v. City of Pittsburgh, 975 F.3d 327, 339 (3d Cir. 2020); Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997); accord Templeton v. Jarmillo, 28 F.4th 618, 621 (5th Cir. 2022); Williams v. Maurer, 9 F.4th 416, 430 (6th Cir. 2021); Humphries v. Milwaukee Cnty., 702 F.3d 1003, 1006 (7th Cir. 2012); Hanson as Tr. for Layton v. Best, 915 F.3d 543, 548 (8th Cir. 2019); Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 946 (9th Cir. 2017); Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989); Washington v. Howard, 25 F.4th 891, 897-98 (11th Cir. 2022); Palmieri v. United States, 896 F.3d 579, 586 (D.C. Cir. 2018).

As the Third Circuit has put it, the "plaintiff[] . . . must cite existing precedent that puts the question beyond debate." Dongarra, 27 F.4th at 178 (cleaned up).[15]

In the example from above, if there is a temporary-structure case out there, it is for the plaintiff to find, not the defendant.

*    *    *

A critical qualifier.

---

[15]  Two points.  First, all of this, as noted, assumes that a defendant has gotten the ball rolling in the first place, by moving to dismiss based on qualified immunity.  It is the defendant who must start things off because qualified immunity is an affirmative defense.  See Crawford-El v. Britton, 523 U.S. 574, 587 (1998); Gomez v. Toledo, 446 U.S. 635, 640 (1980).  This suggests a burden-shifting approach.  The burden out of the gate is the defendant's.  And once he has carried it far enough, the burden slides over and becomes the plaintiff's to shoulder.  Second, no one needs to come forward with any authority when the alleged violation of law is entirely obvious; in that situation, finding sufficiently on-point "clearly established" case law is unnecessary for either the plaintiff or the defendant.  See Urda, 2025 WL 2046175, at *1 (citing Hope v. Pelzer, 536 U.S. 730, 734-35, 741-42 (2002); Taylor v. Riojas, 592 U.S. 7, 8-9 (2020)).

The Third Circuit has sometimes suggested that the burden of establishing qualified immunity rests with the defendant from start to finish --- and that the defendant, not the plaintiff, is therefore the party required to come forward and show that the relevant body of law is clearly established.  See, e.g., E. D. v. Sharkey, 928 F.3d 299, 306 (3d Cir. 2019) ("[T]he burden is on the defendants to . . . show that a reasonable person in their position at the relevant time could have believed . . . that their conduct comported with recognized legal standards.") (citing Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001)).

This implies that there may possibly be a split within the Third Circuit cases on this point.[16]

But as noted just above, the weight of Third Circuit authority runs the other way.  And so does the Supreme Court's decision in Davis, 468 U.S. at 197.

###    B.   Analysis

Come back now to this case.

Recall the basis for the Defendants' arrest of the Plaintiff:

---

[16]   And in some other circuits, too.  For example, different First Circuit panels seemed to have landed on different approaches.  Compare Sullivan v. Carrick, 888 F.2d 1, 3 (1st Cir. 1989) ("[The defendant], in asserting his defense of qualified immunity, must prove that the conduct complained of 'does not violate clearly established statutory or constitutional rights.'"), with Rivera-Corraliza v. Morales, 794 F.3d 208, 214 (1st Cir. 2015) ("[T]o overcome that defense plaintiffs must make a two-step showing --- that (a) defendants violated a statutory or constitutional right and that (b) the right was clearly established at the time.").  And same in the Second Circuit.  Compare Palmer v. Richards, 364 F.3d 60, 67 (2d Cir. 2004) ("It was, of course, [the defendant's] burden at summary judgment to show the nonexistence of a clearly established right and his entitlement to qualified immunity."), with Radwan v. Manuel, 55 F.4th 101, 114 (2d Cir. 2022) ("Absent controlling authority, a plaintiff must show 'a robust consensus of cases of persuasive authority'" showing the law was clearly established.).  And in the Fourth.  See Henry v. Purnell, 501 F.3d 374, 378 n.4 (4th Cir. 2007) (recognizing intra-circuit split).

The Plaintiff was protesting outside MMA.  The Doctor was there, and the Defendants concluded the protest could be heard from his office.  See Complaint, Exhibit A, at 8.[17]

The Defendants' arrest of the Plaintiff was, in part, for violating N.J.S.A. § 2C:29-9a.  See Complaint, Exhibit A, at 1.

The statute:

> [A] person is guilty of a crime of the
> fourth degree if the person . . . purposely
> or knowingly violates a condition to avoid
> all contact with an alleged victim[.]

Given what he knew, could "a reasonable officer . . . have believed [the Plaintiff's] arrest to be lawful"?  Hunter, 502 U.S. at 227.

The parties zero in one aspect of this question, on one statutory element.

Namely, "could" a reasonable officer "have believed" that "contact," N.J.S.A. § 2C:29-9a, was made by the Plaintiff with the Doctor, such that an arrest was authorized under New Jersey law?[18]  See Motion to Dismiss at 25-31; Opposition Brief (ECF 34) at 7-8.

The Court's conclusion: yes, a reasonable officer "could have believed" the Plaintiff was making "contact."

Why?

Because under New Jersey law, (1) coming near a protectee,[19] and then (2) interacting with the protectee, including by speaking

---

[17]  The information in the text is drawn entirely from the Plaintiff's Complaint and the materials he has attached to it. The Court can rely on these materials here.  See Oliver v. Roquet, 858 F.3d 180, 190 (3d Cir. 2017); Miller v. Clinton Cnty., 544 F.3d 542, 550 (3d Cir. 2008);  Prager v. LaFaver, 180 F.3d 1185, 1189 (10th Cir. 1999); cf. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007); Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004); Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

[18]  If "contact" was made by the Plaintiff, he "violate[d]" N.J.S.A. § 2C:29-9a, the state judge's "condition to avoid all contact with an alleged victim[.]"  Id.

[19]  That is, someone protected by a restraining order.

loudly enough to be heard by the protectee --- that generally counts as "contact." <u>See</u> Part II.B.1; <u>cf</u>. Part II.B.2.

And that is what the Plaintiff assertedly did here.

The Plaintiff approached the Doctor's workplace.  And from that spot, the Defendants believed, the Plaintiff was interacting with the Doctor --- raising his voice to the point he could be heard by the Doctor.  <u>See</u> Part II.B.3.

### 1.   **New Jersey Law**

To see what counts as "contact" under New Jersey law, look first to <u>State</u> v. <u>D.G.M.</u>, 439 N.J. Super. 630 (App. Div. 2015).

There, a restraining order barred the defendant "from having any (oral, written, personal, electronic or other) form of contact or communication with" his ex-girlfriend.  <u>Id</u>. at 633 (quoting the order).

That restraining order, like the one here, did not define "contact."  <u>See</u> <u>id</u>. at 637.

The defendant filmed his ex-girlfriend at a soccer game.  Was that contact?  Yes, the appellate court held.  <u>See</u> <u>id</u>. at 633.

Looking to a dictionary, the court said, "we think it likely 'contact' as used here means 'to get into contact or in touch with.'"  <u>Id</u>. at 638 (quoting 3 <u>Oxford English Dictionary</u> 806 (2d ed. 1989)); <u>see</u> <u>also</u> <u>Contact</u>, n., sense 2, <u>New Oxford American Dictionary</u> (2024) ("the state or condition of communicating or meeting").

The court gave examples of "contact" and its close synonym, "communication."  <u>See</u> <u>D.G.M.</u>, 439 N.J. Super. at 638–39. Contact included "telephoning the victim even when separated by many miles, or by gesturing at or toward the victim from across a room, from a passing automobile, or from the opposite side of a soccer field or baseball diamond."  <u>Id</u>. at 639.

Per the appellate court, another example of "contact," critical for this case, was approaching a person protected by a restraining order "close enough to be heard in a normal tone of voice."  <u>Id</u>.

The defendant at the soccer game, the appellate court concluded, "was engaged in sending a message or conveying thoughts" by pointing a camera at his ex-girlfriend.  <u>See</u> <u>id</u>. at 640.  "A

defendant's mere act of filming or even simply staring at a victim sends a message." Id. This was contact. See id.

The meaning of the message was beside the point. See id. The "mere act of filming or even simply staring at a victim sends a message and, in many instances, a message sufficiently alarming or annoying, or even threatening, so as to constitute the type of conduct the Legislature had in mind when enacting" the domestic-violence statute. Id.

Under D.G.M.'s understanding of "contact," the Defendants in this case could have reasonably believed the Plaintiff to have violated the state court's restraining order.

D.G.M. said that sending a message to someone else is contact. And here, the Defendants could have reasonably believed that the Plaintiff was sending a message to the Doctor by audibly protesting outside his office.

Moreover, D.G.M. said that approaching someone close enough to be heard in a normal tone of voice is contact.

By that logic, the Defendants in this case could have reasonably concluded that being a little farther away while speaking somewhat louder --- "[loud] enough to be heard," Id. at 639 --- is also contact.

                    *    *    *

In broadly defining "contact," D.G.M. built on earlier New Jersey cases.

For instance, State v. J.T., 294 N.J. Super. 540 (App. Div. 1996), also suggested that staring at a protectee from some distance is contact.

In J.T., a restraining order barred the defendant "from having contact with the victim including, but not limited to entering plaintiff's residence." Id. at 542 (cleaned up).

The defendant sat on the ground outside the victim-protectee's home, staring at her. See id. He remained 20 to 25 feet away, separated from the victim-protectee "by her backyard, a fence, a large driveway that serves `the entire apartment complex, another fence and the additional distance between [himself] and the fence." Id. at 542 n.2 (quoting defendant's brief).

No matter, the appellate court held. By "position[ing] himself where his wife could see him as she exited the house," he

violated the no-contact order.  <u>Id</u>. at 544.  It was irrelevant that the defendant did not speak to his wife.  <u>See id</u>. at 543.

*    *    *

Bottom line:

Under the New Jersey cases cited above, a person subject to a restraining order who (1) gets into the general vicinity of the protectee and then (2) interacts with the protectee has made "contact."

Examples of "contact" include approaching a protectee (whether at a soccer game, across a field or a room, or from a passing car, <u>D.G.M.</u>, 439 N.J. Super. at 639) in combination with some interaction, however glancing (making a phone call, pointing a camera, staring, speaking, gesturing, <u>see id</u>. at 639-40, <u>J.T.</u>, 294 N.J. Super. at 542).[20]

And this case, too, involves a combination of proximity and interaction.

The Plaintiff approached the Doctor's workplace and made sounds there that reached his office.

### 2.   Non-New Jersey Cases

Although New Jersey law controls here, <u>see</u> footnote 13, it is a bit sparse.

The Court has searched but found only two relevant cases, the ones described just above.  <u>See</u> Part II.B.1.

As a way of double-checking that this Court is getting the content of New Jersey law right, look briefly now to how courts around the Nation have tended to understand the relevant issues.[21]

---

[20]  Here, the restraining order did not just bar "contact."  It barred "<u>any</u> contact."  Complaint, Exhibit B, at 8 (emphasis added).  The word "any" stretches the meaning of "contact" to its outer limit.  <u>See</u> <u>Khalil</u> v. <u>Joyce</u>, 2025 WL 1232369, at *9 (D.N.J. Apr. 29, 2025) (explaining the point).

[21]  States are generally empowered to make their own laws.  But often enough, different states land in the same places as to recurring questions.  That is why, for example, to predict what state A's law is, a look to the law of state B and state C will

13

Consider some examples of what has been held to be "contact":

- The defendant went to a vacant lot next to the protectees' home, shouted at them, and shot off ammunition. <u>Swett</u> v. <u>Gates</u>, 297 A.3d 944 (Vt. 2023).

- The defendant went to a dog park the protectee was known to frequent and looked at her while grinning. <u>State</u> v. <u>Tunley</u>, 294 P.3d 1092 (Haw. Ct. App. 2013).

- The defendant went to the protectee's workplace window and made five to ten seconds of eye contact. <u>State</u> v. <u>Lindell</u>, 820 N.W.2d 769 (Iowa Ct. App. 2012).

- The defendant returned to an apartment when he knew protectee would be visiting and watched her swim from a distance. <u>State</u> v. <u>George</u>, 2011 WL 1743884, at *1 (Minn. Ct. App. May 9, 2011).

- The defendant attended a pretrial conference where he waved a book at the protectee and shouted at her to "tell the truth." <u>State</u> v. <u>O'Grady</u>, 147 Wash. App. 1044 (2008).

- The defendant stopped his truck 40 feet from the protectee's workplace window and started shouting. <u>Commonwealth</u> v. <u>Habenstreit</u>, 786 N.E.2d 425 (Mass. App. Ct. 2003).

---

often be clarifying. <u>See</u>, <u>e.g.</u>, <u>Badalamenti</u> v. <u>Resideo Techs., Inc.</u>, 755 F. Supp. 3d 534, 541 (D.N.J. 2024); <u>Howard</u> v. <u>Wells Fargo Bank, N.A.</u>, 733 F. Supp. 3d 352, 357 (D.N.J. 2024), <u>aff'd</u>, 2024 WL 4890984 (3d Cir. Nov. 26, 2024); <u>Navigators Specialty Ins. Co.</u> v. <u>Citizens Ins. Co. of Am.</u>, 739 F. Supp. 3d 259, 267-68 (D.N.J. 2024). And that is why, to take another example, restatements of the law can aim to range across the 50 states and to generate a faithfully encompassing summary of the overall law. <u>See generally</u> <u>Centennial Plaza Prop, LLC</u> v. <u>Trane U.S. Inc.</u>, 771 F. Supp. 3d 481, 490 n. 17 (D.N.J. 2025). That is a plausible aspiration because of a felt sense that when it comes to the broad brushstrokes, there is often a real coherence to American law. Massachusetts or Colorado or Alabama <u>can</u> opt for wholly distinct approaches to proximate causation or to apparent authority. But often they do not. Why does this matter here? Because in the absence of a great many decided New Jersey cases to lean on, it helps to peek at other states' laws. Other states see proximity plus interaction as equaling contact, as described in Part II.B.2. And that helps to firm up the conclusion that New Jersey law is to similar effect --- even though there are relatively few New Jersey cases to go on.

- The defendant stopped his car near the protectee at a bus stop and stared at her.  State v. Danaher, 819 A.2d 691, 693, 696 (Vt. 2002).

- The defendant went to the protectee's neighborhood and stared at her from the opposite end of her street.  Commonwealth v. Tate, 612 N.E.2d 686, 689 (Mass. App. Ct. 1993).

### 3.    Conclusion

The cases from around the country collected just above, see Part II.B.2, dovetail closely with the understanding of New Jersey law set out in Part II.B.1.

They buttress the Court's understanding, see footnote 21, that under New Jersey law "contact" in violation of a no-contact restraining order includes (1) coming somewhat near a protectee, and then (2) interacting with the protectee (and even in ways that are purely one-sided --- like staring, yelling, or pointing a camera).[22]

Given this backdrop, the Defendants are plainly entitled to qualified immunity here as to the claim that they falsely arrested the Plaintiff.

The reason:

The Defendants "could have believed," Hunter, 502 U.S. at 227 --- and reasonably, see id. --- there was probable cause to think that the Plaintiff was violating the judge's no-contact order.

After all, the Plaintiff came near the Doctor, by standing outside MMA while the Doctor was there.  And the Plaintiff interacted with the Doctor, raising his voice loudly enough to reach the Doctor's office.

What this adds up to: the Defendants are entitled to qualified immunity.

And this conclusion is bolstered by federal case law.

To see the point, look to two cases.

---

[22]  That proximity plus interaction counts as "contact" does not imply that other things (even lesser things) do not count as contact.

Each concerns factual circumstances at least somewhat analogous to those here.

And in each of the cases, local police officers made an allegedly false arrest based on an asserted violation of a restraining order --- and were granted qualified immunity.

                    *       *       *

The stepping off point is Ulrich v. Pope County, 715 F.3d 1054 (8th Cir. 2013).

There, a restraining order barred a man from having "any contact . . . , direct or indirect," with his ex-girlfriend or her children.  See id. at 1057.

The man attended a school graduation; the ex-girlfriend and one of her children were there.  See id.  The man did not communicate with them, did not plan to do so, and invited responding officers to sit beside him to ensure he would not. See id.

But the officers arrested him for violating the restraining order and held him for some 90 hours at the county jail.  See id. at 1057-58.  The man later sued the officers under Section 1983 for false arrest.  See id. at 1058.

Did the officers have qualified immunity?

Yes, the federal court of appeals held.

No precedential state opinion defined "indirect contact" in the right context.  See id. at 1059-60 & n.5.  But some unpublished opinions held that proximity to a protectee counted as indirect contact.  That, the court explained, was evidence of the reasonableness of the officers' interpretation.  See id. at 1059-60.  The court therefore held that the officers were objectively reasonable in believing that there was probable cause to make the arrest.  See id. at 1060.

Ulrich was a closer case for qualified immunity than this one.

In Ulrich, no reported state cases shed light on the meaning of "indirect contact," the key term at issue.  The officers were operating on a relatively blank slate --- and got qualified immunity.

Here, reported New Jersey cases stand for the idea that presence plus interaction --- what the Plaintiff was doing here ---

equals "contact."  See Part II.B.1.  That means the Defendants were here operating against a backdrop of case law that affirmatively suggested that their arrest of the Plaintiff was lawful.

If no meaningful guidance from the case law can allow for false arrest qualified immunity (as in Ulrich), then qualified immunity is that much more appropriate in cases like this one --- in which the case law tends to affirmatively imply that the arrest was lawful.

*    *    *

Take now another case, Habiger v. City of Fargo, 80 F.3d 289 (8th Cir. 1996).

There, a court enjoined protesters from "obstructing the work of the persons located at [a medical clinic] by any means --- including singing, chanting, yelling, shouting, or screaming --- that substantially interferes with the provision of medical services."  Id. at 292 (quoting Fargo Women's Health Org., Inc. v. Lambs of Christ, No. 91-1953 (Cass Cnty. Dist. Ct. Oct. 28, 1991)).

Officers arrested a protester outside the clinic for violating the order.  See id. at 294.

The protester sued the officers under Section 1983, alleging that he was arrested without probable cause.  See id.

The court of appeals concluded that the officers had qualified immunity.  The officers, the court explained, had to answer a question: did the protester violate the court order by substantially interfering with the operations of the facility?  See id. at 295.

"[T]he 'substantial interference' standard had yet to be interpreted."  Id. at 296.  But with the protester "shouting at the top of his voice from a point some" one hundred feet from the facility, the officer thought that the noise would reach that far, substantially interfering with operations.  Id. at 295.

That was "a reasonable interpretation of the law [an officer] is obligated to enforce," and so the officers arguably had probable cause.  See id. at 295-96.  That, in turn, gave them qualified immunity as to the false arrest charge.  See id. at 297.

_Habiger_, like _Ulrich_, was a closer case than this one for qualified immunity.

The state law in _Habiger_ did not define the critical term ("substantial interference"), and officers got qualified immunity.

In this case, state law does define the critical term ("contact"), and in a way that arguably seems to affirmatively provide legal justification for the Defendants' arrest decision.

If there was qualified immunity in _Habiger_, as there was, then it follows there should be qualified immunity here.

### C.   **Two Added Points**

The Defendants here are entitled to qualified immunity because they "could have believed," _Hunter_, 502 U.S. at 227, that the Plaintiff was making forbidden "contact" with the Doctor.

Indeed, the Defendants' arrest decision may have been affirmatively lawful under New Jersey law.  _See_ Part II.B.1; _cf_. Part II.B.2.  The Plaintiff, after all, was present where the Doctor was, and interacted with him (though in a one-sided way). And that would seem to be enough to establish probable cause for a N.J.S.A. § 10:6-2 violation.

In any event, the Defendants' decision to arrest the Plaintiff was more obviously authorized under the relevant governing law than the arrest decisions of the officers in _Ulrich_ and _Habiger_ --- and in those cases, the officers got qualified immunity. _See_ Part II.B.3.

Two other points strengthen the conclusion that the Defendants get qualified immunity here.

_First_, the Plaintiff was required to come forward with "clearly established law," a case or a statute to show that the Defendants' arrest decision was at odds with New Jersey law. _See_ Part II.A.  The burden was the Plaintiff's.  _See_ _id_.  But he did not try to carry it.

_Second_, on the same day as his arrest, a state judicial officer found probable cause that the Plaintiff had violated the restraining order.  _See_ Motion to Dismiss, Exhibit A, at 1.  And the judicial officer did so based on virtually the same facts that the officers are said to have known at the time they made the arrest.  _See_ _id_.

That is a strong signal that the Defendants acted in a "reasonable" way and therefore are entitled to qualified immunity.  See Marcavage v. Nat'l Park Serv., 666 F.3d 856, 859-60 (3d Cir. 2012); Schimandle v. Dekalb Cnty. Sheriff's Off., 114 F.4th 648, 657 (7th Cir. 2024); Washington v. Napolitano, 29 F.4th 93, 105 (2d Cir. 2022); Hupp v. Cook, 931 F.3d 307, 324 (4th Cir. 2019); Jones v. City of Grand Prairie, 209 F.3d 719 (5th Cir. 2000); see generally Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (in the context of a seizure made pursuant to a state judicial warrant, stating "that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner"); Hunter, 502 U.S. at 228 (making a similar point where the state judicial officer found probable cause after officers arrested man).[23]

**D.   The Counterarguments**

Against the conclusion that the Defendants are entitled to qualified immunity, the Plaintiff first offers up a procedural counterargument: that qualified immunity is inapplicable on a motion to dismiss.  See Opposition Brief at 13-15.

But this is not persuasive.

Courts are required to resolve qualified immunity questions "at the earliest possible stage in litigation," Hunter, 502 U.S. at 227 (collecting cases), and that includes on a motion to dismiss.  See Eddy v. V.I. Water & Power Auth., 256 F.3d 204, 210 n.3 (3d Cir. 2001).

The Plaintiff also argues that he actually abided by the restraining order.

---

[23]  State judges are the experts on state law.  See generally Martin v. Waddell's Lessee, 41 U.S. (16 Pet.) 367, 390 (1842) ("[T]he state judiciary is presumed best to know its own law[.]"); accord Moore v. Sims, 442 U.S. 415, 429 (1979); Bell v. Morrison, 26 U.S. (1 Pet.) 351, 359-60 (1828).  And the logic of the cases cited in the text is apparently this: if an expert on state law, a state judge, thought that the proffered facts meant there was probable cause to believe that state law was violated --- that tends to suggest that the markedly lower qualified immunity standard, which zeroes in on whether a police officer "could have believed" there was probable cause that state law was violated, is also satisfied.

He says that a verbal statement from the judge who issued the restraining order let him go to MMA, even as it barred him from contacting the Doctor.  See Opposition Brief at 7.  And the Plaintiff further states that the Defendants knew this when they arrested him.  See Complaint ¶¶ 27–28; Letter of May 30, 2025 (ECF 37).

But even assuming arguendo that all of that is accurate, the analysis does not change.

The argument seems to be that when a person subject to a no-contact restraining order (like the Plaintiff) interacts with the protectee (by making his voice heard) --- that does not actually count as "contact," provided he (again, here the Plaintiff) is in a place where he is allowed to be.

But the Plaintiff bears the burden here.  See Part II.A.

And he does not explain how his interpretation squares with what the state judge ordered.  The judge made clear that even though the Plaintiff could go to MMA, he nonetheless could not "contact" the Doctor.  See Complaint, Exhibit B, at 1 ("I'm not prohibiting you from going to that location. I'm prohibiting you from having any contact with the [Doctor], either directly or indirectly.").  This strongly implied that simply being lawfully in a place did not mean that interacting with the Doctor would then be allowed.

Moreover, the Plaintiff points to no case or statute that suggests that his apparent understanding of New Jersey law is "clearly established."

And it bears noting that the Plaintiff's approach is at odds with everyday restraining-order practices.  If person A is restrained from contacting person B and then calls her, it would plainly not work for person A to say that he was allowed to make the call --- because he was in his own living room when he got on the phone, a place he was allowed to be.

But that is essentially what the Plaintiff says "clearly established" New Jersey law allowed him to do here --- to interact with the Doctor, but not to be arrested for "contact[ing]" him, because at the moment of the contact the Plaintiff was at MMA, a place he was not forbidden by the judge from going.

### III. **Police Supervisors**

To this point, the Court has concluded that the Defendants are entitled to qualified immunity.  See Part II.

That leaves the claims against the defendants who were not involved in arresting the Plaintiff.

These are Chief Suffern and Deputy Chief Loschiavo.

These two defendants also assert qualified immunity.  See Motion to Dismiss at 3, 29-32.

But the legal papers contain no arguments as to the Chief or Deputy Chief.  That makes it hard to say that they might be entitled to qualified immunity.  See, e.g., Duran v. Merline, 923 F. Supp. 2d 702, 725 (D.N.J. 2013) (reaching same conclusion where officer "has not provided any explanation as to why he is entitled to such immunity with respect to this claim in particular") (cleaned up).

It is perhaps no surprise that the papers are silent as to defenses that might be pressed by the Chief and/or the Deputy Chief.  The Complaint says nothing about any role they might have played in the Plaintiff's arrest; it alleges only that they held certain senior jobs in the relevant police department.  See Complaint ¶¶ 9-10.

Not having been accused of anything, the police supervisors may have felt there was little need to say much of anything in order to get the case against them dismissed.  Cf., e.g., Stokes v. Payson, 2024 WL 2817969, at *2 (D. Del. June 3, 2024); Gorrio v. Terra, 2023 WL 8373167, at *7 (E.D. Pa. Dec. 4, 2023); Davenport v. Cumberland Cnty. Pub. Def., 2021 WL 4699203, at *2 (M.D. Pa. Oct. 7, 2021); Wicks v. Corbett, 2012 WL 4953084, at *2 (M.D. Pa. Oct. 16, 2012); Carroll v. Allegheny Cnty. Jail, 2011 WL 13579611, at *2 (W.D. Pa. July 27, 2011), report and recommendation adopted, 2011 WL 13579610 (W.D. Pa. Aug. 17, 2011).

But that is not how it works.

If the Chief and Deputy Chief wish to seek dismissal, they must meaningfully develop an argument as to why dismissal makes sense.  To this point, they have not tried to do so.

In light of the foregoing, the Court will issue a text order soliciting the parties' views as to the appropriate next steps as to the Chief and the Deputy Chief.

## IV.  Conclusion

The motion to dismiss is granted (a) on the merits as to Count VI, see footnote 7, and (b) based on qualified immunity as to Officer Calderin and Detective Moreno.

IT IS on this 30th day of July, 2025, so **ORDERED.**

_____
Michael E. Farbiarz, U.S.D.J.